The next case to call for oral argument is ASSCME, Council 31 v. IL Labor Relations Board, 516.0229. Council? May it please the Court, this is another case involving a basic principle of labor law. And it's the basic principle that while you're negotiating with the union, that the employer has to maintain the status quo. Both during the negotiations prior to the expiration of a contract and in the negotiations after the expiration of a contract. There are the Supreme Court and the federal health courts have called this an inviolate principle of United States labor law. And the Fourth District Appellate Court in the Vianney case adopted the Supreme Court's decision in the Katz case and that principle. Now there are some exceptions that are important here, such as what happens when you get to impasse or what happens if one side waives their rights in a situation or another. But the basic principle that you can't change terms absent an impasse in negotiations is one that we all agree on in this room. So the issue in this case is what is the status quo? What are the existing terms and conditions of employment? And our answer to that question is that the contract between the parties that existed prior to its expiration contained a salary schedule, a stipend. And that salary schedule provided that people would move through it on an annual basis. And that that salary schedule is the status quo that existed as of the day of the contract expiration. And that, therefore, the day after the expiration of the contract, if I gained my full year of service, I was entitled to move to the next step in the schedule. To illustrate the point that I just made, if I start with the state on, let's say I started with the state on June 25th, 1990. Well, on June 25th of 2015, I would have been, excuse me, that was a terrible example. Let's say I started with the state on June 25th, 2010. That means that on June 25th, 2015, I would have been eligible to move from step five, because I started in step five, to step six. But if I started on July 10th, 2010, under the state's conduct in this case, I don't get to move under the salary schedule. Now, I mentioned the Vianna case. And the reason I mentioned the Vianna case is because the Vianna case, too, concerned a salary schedule. And that was a salary schedule that was based upon education and years of service. It had been in place for 10 years. And the parties had not finished, and the teachers union had come around and organized the people in the unit a couple of years before the case arose. And while they were bargaining for the very second contract, the issue came up, okay, I'm back. We don't have a new contract yet. Do I move to another year? And the Educational Labor Relations Board said yes, and that decision was upheld by the court in the Vianna case. And what the court of Vianna said, and I'm just going to quote the last paragraph of the opinion, is that the policy underlying the act, as well as the weight of authority from other jurisdictions, supports the concept of status quo, which includes an evaluation of past history, and a review of the statute. Past history, past bargaining practice, existing contract terms, and the reasonable expectations of the employees. So I think if you look at each one of those factors in this case, no two cases are exacted on points, but there's just a tiny airbrush difference between this case and Vianna. And I think under Vianna, therefore, you have to reverse the board decision. So one thing Vianna mentions is contract leverage. And if you look at the contract, the contract contains a salary schedule in it that says it's effective July 1, 2014. It doesn't say it's effective just for a period of time between 2014 and 2015. It just says effective July 1, 2014. And it contains a definition that deals with steps. And it says specifically that employees shall receive a step increase to the next step on satisfactory completion of 12 months of creditable service. And again, there's no limitation that says for the period of this contract or during the years, blah, blah, blah. It's a very specific and declarative one. So in terms of what the contract says, the written document that governs the relations between the parties, if an employee looked at this, they would say, yes, I'm supposed to get my step. So then you look at past history. What does past history tell us? Well, past history tells us that between 1984 and 2012, people got their steps every single year, every single time like clockwork. And again, in terms of the Vianney case, they had 10 years of past history. We had over 25 in this case. So look at past bargaining practice. Well, you look at the past bargaining practice, and there are sort of three sets of situations that stand out. One is, what was the practice before collective bargaining? And before collective bargaining started in the State Bill of Rights for State Employees, they had a step plan that people moved on the step plan. That happened every year as the parties bargained contracts under the state pay plan until 1983. And in 1983, there was a severe recession. And so there was a temporary delay by agreement of the parties to move in on the steps. But after that delay occurred, what happened was that people moved to the correct step, and they received lump sums for the money that they had missed by not moving, so that their credible service state would stay the same with the state. And that happened in both of the scenarios in question, and it made people whole. So that if you were working for the state in 1990 and somebody said to you, did you get your step increased for every year between 1980 and 1990, you would say, yeah, I got it every year between 1980 and 1990. Now, my delay was that there was a delay in 1983, but I got it. Now, in 2013, what happened was that the parties were in negotiations, and the employer withheld steps. And the union protested that. They filed agreements. They filed an unfulfilled labor practice charge. The parties eventually agreed on a contract, and they later settled the grievance for the payment of steps. And so again, while there was a delay, the step was ultimately paid. And so if you were a state employee in 2015 and somebody said, well, you weren't here since 1980, what's happened, you could say, I got my step every single year. And that's the state of the play. So in terms of the bargaining practice, the contract terms, and the history, a reasonable employee would expect to get their steps at the end of the contract. Now, the board went wrong, and the board went wrong because it didn't look at a couple of things. Number one, it never looked at the issue of were there steps, was there a progression before bargaining started? Because obviously before bargaining started, that's a unilateral action of the employer. And the fact that there were steps is evidence that even when the employer had the freedom to act unilaterally, they had a plan in place that contained steps. They also went wrong because they didn't properly look at what happened in 2013, where in 2013, while the steps were delayed, they were eventually paid under a grievance settlement between the parties. The employer could have gone to arbitration, they could have fought the UOP, but instead, they made a grievance settlement, and as a result, the union members were paid steps, and the union withdrew the unparalleled practice charge that it had filed. So again, fast forward, if you're an employee in June of 2015, and somebody says to you, did you always need your steps? You would say, I always got my steps. And if you were to go over to central management services and say, have steps always been paid for employees between 1984 and 2015? The answer would be yes, because they were paid eventually in 2013. In addition to the fact that there's the history, there's also the backstop, and the backstop is what's called the pay plan. The pay plan is a document that is promulgated regularly by the Department of Central Management Services that defines what people get paid. And under the personnel code, the pay plan has the force of law. And that pay plan also contained steps for all these years, and in 2015 as well. So what happened was that when the contract expired in 2015, the state said to the union, we're not going to pay steps. The parties worked on the bargaining, and they knew that they were going to go past the deadline of the expiration of the contract. So they entered into what they call a tolling agreement. And in the tolling agreement, the parties acknowledged that they had a difference of opinion about steps, but they also retained all of the rights that they would otherwise have. And as a result, we got to the unfair labor practice charge in this case, and the unfair labor practice ruling in this case. What's important about the state's position in this case is that they stipulated before the ALJ that the reason why they did not grant the steps was because the steps were something that they were still negotiating. Well, if you give any weight to that stipulation, you've turned the whole doctrine of good faith bargaining and status quo inside out. Because in any set of bargaining, you'll have a lot of issues on the table. And if you go into overtime like what happened in this case, some of those issues will not be resolved. The issue of health insurance wasn't resolved at the time the contract expired. Did that mean because the issue of health insurance was a subject of bargaining that the state could unilaterally implement something different than what everybody expected? The answer to that is no. There were other economic issues. For example, at the time, June 30th of 2015, the state was proposing to cut people's vacation entitlement. Did the fact that that proposal was on the table mean that they could unilaterally cut people's vacation entitlement? Nobody thought so. And, in fact, that vacation entitlement is the same today because the parties still do not have a contract. So the fact that the state stipulated that the reason why they took this action was that they were in negotiations is a concession to them, or is a concession that they didn't take it because they thought they had the right to under all of the factors that are set forth in the Biden case. And if you look at the briefs in this case, and you look at the federal cases that we said in our brief in the Biden case, and cases involving salary schedules that are based upon seniority, you'll find that all of those cases hold that when the contract expires, people can keep moving in their salary schedules. And you will not find a single case of the agency or of the Federal National Labor Relations Board that holds the opposite. And I think it's very useful in this respect to compare what I cited in the Biden case, what the facts are in this case, with the Thornton case, which is a case from the First District, and which is cited in the brief of the respondents. And in the Thornton case, you didn't have contract language. You had a practice that applied to two people. And you had a practice that had been applied by people who were beneath the top level of the school district. And in that case, the court, I think, quite reasonably said that evidence is not there to prove a practice. You compare that to our case where you have a practice that was applied over decades to thousands and thousands of people that was encompassed in a written pay plan. And I think our case is much closer to the result in Vietta and that Vietta would require this court to overrule the decision of the Labor Relations Board. Now, Central Management Services argues a couple of things. One thing they argue is that Section 21.5 of the Labor Act eliminates the need to pay steps. And essentially what their argument is, is that because the contract was void under Section 21.5 of the Labor Act, that contract did not serve as the basis for determining what the status quo is. That's their argument. The problem with their argument is, and I'm going to get into other problems in a second, but the problem with that argument, if you take it as a given, is that Central Management Services never offers any other way to determine the status quo. So how do you know what the status quo is except by virtue of, well, what are my rights? Why am I getting paid on June 29th and June 30th? Well, didn't they pick a status quo? They... I mean, they picked a date. I'm sorry. Didn't the state pick a status quo when they picked a date? They... Did they pick a status quo? I mean, they said, well, we're going to pay you effective as of 2014. July 1, 2014. Well, if they did, then if you pick 2014 as the status quo... I mean, that seems... I think that's the best we need. And if you do that, then what you're stuck with is the salary schedule that was in effect on July 1, 2014. And if that's the status quo, that status quo has progression based upon seniority. But my confusion is if they take the position that it's void under 21.5, how do they pick a status quo? I don't know. I've never gotten a good answer to that question. Maybe I'll ask. And I think that... I won't say that's the best question you'd ask, Judge, because I think all the questions have been good questions. But I will say that the problem is that if this contract is null and void, what do we do? Do we go back to the 2008-2012 contract and leave the insurance in that contract? I think the most refined thing that they could say is that a particular provision might be null and void. But even that is really unsatisfactory because then it doesn't give you any guidance as to what replaces it. And so I think the board was right when it said we're dealing with a statutory thing, not with a contractual thing. And what we'll do is we'll look at the terms and conditions of employment people actually have. And by virtue of the statute, you have to continue those. Our argument with the board is that those terms and conditions of employment involve your right to move as you recoup more time in your time. Now, in addition to that point, which I think is sufficient to reverse the board and to reject the argument of central management services, there are two other things that are important about their argument based upon Section 21.5. One is, is that if they're right and Section 21.5 means that this whole book for the whole three years is void completely and terminated, then the fact that they paid step increases between January of 2015 and June of 2015 weighs really heavily against them because it means that they were doing it unilaterally. And again, if it's them doing it unilaterally, that's even better evidence of what would create a reasonable expectation in a reasonable employment. Now, we don't think that the General Assembly meant when it said you can't increase wages and salaries in the time-creating question, that they meant that you can't have a salary progression based upon service. We think that the General Assembly was talking about wage increases, such as general wage increases, or other benefits that you could change that would give people more money than they otherwise would have after that magic January day. And I think the best way to illustrate that is I think there's a difference between terms and conditions of employment that are applied to everybody in a unit and terms and conditions of employment that are individual. So if I get a promotion, I get a salary increase. Or if I get temporarily assigned to a higher-rated job, I might get a salary increase. And CMS does not argue that in those two situations, my increase in salary is invalid. And so by analogy, I would say that another incident of seniority, that being the movement and the step progression, that's an individual thing. It's not an increase that applies across the board to a whole unit. And in fact, you know, in this unit, you have 8 or 11 steps, depending upon when you were hired. And so that means that if you're a state employee who was hired in 1990, you're not getting steps anymore. And that means that the progression for steps isn't a unit-wide thing in any of the different units covered by this document. It's an individual thing that you get by virtue of your increased seniority, just like you might get by virtue of a promotion or by virtue of a temporary assignment. So we think that when the board did its analysis in this case, that it should have found that the duty to maintain the status quo was based upon statute. And that it didn't really need to go any further than that. It didn't need to interpret Section 21.5. Because having found that it was based upon the statute and that you looked at the terms and conditions of employment that people were actually under, they should have then proceeded to apply the factors in VIETA and applied them in the correct way. And so we don't think that you necessarily need to get to the issue of what affects Section 21.5. I want to say two more sentences. And that is, is in the reply brief, or in the response brief, there's an argument about a case called State v. AFSCME, which involves the enforceability of an arbitration award. Arbitration awards are rendered under contracts. Here we're talking about the enforcement of a state statute. And there's no case anyplace that says that the legislature can allow somebody to not obey a state statute because they don't incorporate enough money. And that's the often case which we cite in our reply brief. More than two sentences. Sorry. I get called on that all the time. We're used to it, actually. And it's even more obvious just because I'm standing between you and Marcia. That's true, too. Thank you, Counsel. Counsel? May it please the Court. Again, my name is Jeffrey Fowler, along with my partner, Lawrence Weiner. We represent the State of Illinois Department of Central Management Services. Two quick housekeeping issues. In about 10 minutes, if I'm not paying attention to the clock, my partner is going to come grab me by the collar and drag me back to my seat so that Counsel for the Attorney General's Office can have his turn to argue. If that happens, please don't take it that he's disagreeing with what I'm saying. We're used to that, actually. Don't worry about that. The other housekeeping issue, Judge, very briefly, is this case involves the same jurisdictional issue as the one we just referred to, the FAQ case a few minutes ago. And just so we're all on the same page, do you want the same briefs filed in both cases separately? Do you want to consolidate the briefs? What's your pleasure about how we address that? Actually, I don't think we want to tell you how. You're welcome to determine that. We don't want to try your case for you. We'll take care of it, Judge. Thank you. We would grant leave to file in both cases if so chose. Yes, yes. I thought that was implicit, but I'll make it explicit. Thank you. The statute has granted both cases to the 21 days. However you wish to structure it is up to you. Thank you. CMS's position is that with respect to the status quo argument, the board got it exactly right. The issue that we have is that the board should never have gotten to the status quo issue because of the application of Section 21.5 of the Act. Section 21.5 has three separate provisions. 21.5a says that no collective bargaining agreement involving a state constitutional officer can continue after June 30th of the year in which the constitutional officer takes office. In other words, regardless of what the CBA said about a contract expiration term, as a matter of law, the contract terminates as of June 30th period. What about the fact that the state continued to make the step payments for a period of time until June? That ties for the best question of the day, Judge. The point is that when 21.5a says that the contract will terminate as of June 30th, the state's position is that compliance with the terms of the contract from January 12th, the date that the governor was inaugurated until June 30th of 2015, was pursuant to 21.5a. 21.5b says that if the CBA requires wage increases after the date that the constitutional officer took office, which in this case would have been January 12th, 2015, then that's illegal. 21.5c then goes a step farther and says that if there is a CBA that violates this, then it becomes null and void as a matter of law. Because the obligation, and by the way, I believe that this court is going to be the first court in Illinois to construe 21.5. There's not a lot of judicial guidance on it, nor is there legislative guidance on what the meaning is. But when you construe it, we have an obligation to look at all of the terms together. When you look at all of the terms together, terminating and rendering null and void as a matter of law has to mean something different than terminated on June 30th. Our view is that what this statute means is that the state had an obligation to continue to comply with the terms of the CBA that it agreed to until June 30th of 2015. But as of that period, because of the application of Section 21.5c, then the CBA became null and void. Wait, I thought this contract terminated by its terms on June 30th, 2015. It did. So why do we talk about 21.5? Because 21.5c made the terms of the agreement null and void. No, but the contract terms, under the contract terms, the contract itself terminated. Yes, ma'am. So why pull in 21.5 at all? It's 25a says it won't continue as of January 30th. This didn't. Two, requires wage increases after 1-12-2015. Did it? No, because you had to bargain for that. So why are we at 21.5? For exactly the issue that AFSCME is raising in this case. Several times during his argument, Mr. Jokic held up the CBA and said you have to look at the step increases in the CBA to determine what the obligations would be going forward after June 30th of 2015. June 1st, or July 1st of 2015 on a going forward basis. AFSCME takes the position that you must look at the terms of the CBA to determine what the status quo is. Our point to 21.5 is as of July 1st of 2015, that CBA that he was holding up his hands just evaporated. It's null and void as a matter of law. You cannot, or more accurately, the board could not look at the CBA to determine what the terms of the status quo was without looking at the terms of the CBA. There was no reason for the board to get into the status quo analysis at all because there was nothing that the board could look at and hold up and say these are what the question is whether we're going to enforce or require on a going forward basis. The CBA has done it. If this was not a collective bargaining agreement and you had a contract for the sale of goods, for example, and that contract ended on a certain date, you're certainly aware of custom and practice and how that's used. Why is that any different here? They're talking about this was the custom and practice. This was how the status quo has always been maintained under the collective bargaining agreement when prior agreements have expired. This is what's happened. How is that? I still don't understand. Even if this is null and void, even if this document is null and void as it sits here today under 21.5, what precludes them from referring back to what's happened in past years? There's nothing in 21.5 that says that. And we do sort of agree with that, Judge. In the sense that we're not saying that the status quo concept has now become void. We're not saying that the status quo concept is illegal. We're not saying that 21.5 did anything other than say, regardless of what the termination agreement is on the face of the document, it will expire on June 30th, regardless of what the language in the document says about wage increases, and this is a wage increase. That's spelled out pretty clearly in the briefs. If it includes that, it's illegal. It violates 21.5. And 21.5C says that if it includes that, it is null and void as a matter of law, so that in determining what the status quo is, if it can be done, you cannot look to the terms of the CBA. In this instance, the charge is that as of July 1st of 2015, the employer violated the law by not paying step increases as of July 1st. But as of July 1st, there were no step increases. The CBA is done. It's gone. It's null and void as a matter of law. You can't look to the terms of the CBA. This is what we're saying the board couldn't do. And the other argument that they've made is that the step in the pay plan that counsel referred to, the pay plan that for fiscal year 2016 didn't go into effect until July 28th of 2015. Let me ask, I suppose I'm a little bit confused on your argument. You're saying that as of a certain period because of 21.5, the terms of the CBA are null and void. That is not the equivalent of saying that a board, an adjudicative body, looking at custom and practice of determining the history, that the CBA, regardless of its enforceability status at this point in time, that's not the same as saying that it's not relevant to an inquiry as to custom and practice, is it? They're not equivalent. I agree that they're not equivalent. Let me try to be clear. We are not saying that the status quo or custom and practice or anything like that isn't applicable here. What we're saying is that you can't look to the terms of a null and void CBA to determine what those are. But whether it's null and void or not, the terms of the CBA are part of the history, and by definition, they are part of the custom and practice, aren't they? Not because they are terms in a CBA. What you would do, Mr. Yokich, you made a reference, and there was some discussion about the date of when something was triggered. Thank you. See, he did grab me by the collar. At least I'm not debating this. Why not? It's better than a hook. Sorry, what? It's better than a hook. It's not better than a hook. It is better than a hook. What was entirely appropriate is to look and see what people were being paid as of June 30th of 2015. That is the status quo. Whatever they were being paid as of that date is what the terms or conditions are that should continue on a going forward basis. The step increases didn't exist as of that time, and there was nothing for the next two weeks, four weeks. So for the board to have looked at even the possibility of looking at whether step increases would be required, it would be pure speculation. And so because it would be pure speculation, because you can't look to the terms of the CBA, our position is that the board never should have gotten further because there was nothing to apply based upon the specific allegations that were brought. With that said, once the board did get into the status quo issue, then the board exactly properly followed the status quo issue to determine that the status quo of these parties were that step increases were not paid unless there was an explicit agreement between the parties to do that. There was no explicit agreement between the parties to do that in 2012. There was no explicit agreement between the parties to do that in 2015. Therefore, there was no status quo. The one other issue I want to raise, counsel mentioned the grievances that were, and the unfair labor practice that was filed in 2012. And the briefs mention and point out that even though the grievances were filed, because they were withdrawn without full relief, just being paid the steps wasn't full relief, that's not evidence to suggest that what was done in 2012 was inappropriate. It was entirely proper for the board to conclude as they did. And with that, unless your honors have questions, I'll turn it over to you. I don't believe we do. Thank you. Thank you, sir. Counsel? May it please the court? This court should affirm the board's decision because the board did not clearly err when it determined that CMS did not alter the status quo. Initially, I'm very briefly going to address 21.5, and that's in relation to the board's status quo analysis. One thing throughout this whole case is the differentiation between contractual rights and obligations and statutory rights and obligations. Just because the previous CBA may be null and void, that doesn't relieve CMS of its statutory obligations under Section 7 of Bargaining Good Faith and Maintain the Status Quo. In fact, that's why courts have routinely held that even if there is no previous CBA, the employer still has the responsibility to maintain the status quo. And so the board correctly considered all the evidence to determine the status quo, even though the previous CBA was null and void. No, you can say that. That's just a generalized statement. Give me some facts. Put some meat on those bones. Why were they so correct? There was a status quo. Right, yes. That's what I'm going to show you now. Okay, what was it that they so correctly did? Right, so what the board did is to determine the status quo, as Ashley and everybody's mentioned, the Vianna test identifies four different things that you look at. Past practice, past bargaining history, the terms of the previous contract or existing contract terms, and the reasonable expectation of employees. What the board did here is it looked at all the evidence and it accorded the most weight and looked most closely at what had happened previously in these exact circumstances. Because what the board was trying to determine here is what's the status quo during this hiatus period after the previous CBA has expired and terminated and before a new one has been successfully negotiated. What's the status quo in that context? So the board focused most heavily on the three times in the past that it happened. It happened in 1983, 2008, and 2012. And there were kind of two different approaches. In 83 and 08, the parties reached an agreement about what was going to happen with step increases. In 2012, they didn't. And when they didn't reach that agreement, CMS did not pay the step increases during that hiatus. So what the board determined is that that 2012 situation was both the most recent in time and the most factually similar because you have the same circumstances here. And that an employee could not reasonably expect to be paid step increases during the hiatus in 2015 when they were not paid step increases in the same circumstances in 2012. And that's the core of the board's decision is that it looked at what is the status quo in this specific circumstance. And it didn't ignore evidence. It just found that the most pertinent evidence were those three situations. And among those three situations, what had occurred in 2012? Now, AFSCME's argument about why it claims the board's status quo analysis was wrong is essentially arguing that the board weighed the evidence incorrectly. That it should have weighed other evidence more heavily. For example, AFSCME says that the board should base its decision on the fact that steps were paid continuously from 1984 to 2012. But steps were paid in those circumstances by contract, either pursuant to a CBA or an extension agreement following the expiration of the last CBA. The question here is what happens when there is no agreement? What's the status quo then? And you might have, you know, a very different outcome if you had different facts. This is a very fact-dependent inquiry. So the Vianney case, for example, there was an established pattern where these employees all, you know, would always get the step increase. If the facts here were different and, you know, there had been no prior contractual hiatuses, the board's analysis would have been very different. Because it may have weighed different evidence more heavily. It wouldn't have had this opportunity to go, well, look at what happened in this exact circumstance here. And so the board applied Vianney, which has reached a different decision because the facts were different. And this isn't some sort of a new approach or analysis by the board. As cited in the board's brief, this is what the education board held in both Oakwood and Lake Park. They said, well, in the past, there's a past practice of not being step increases during this hiatus period. And therefore, that establishes the status quo because that's the past practice for what happens here during this exact same scenario. The action also argues that the board should have looked more heavily at the terms of the preceding CBA. But again, that's just one consideration. And the board acknowledged that, well, you know, if the terms of the preceding CBA establish the status quo, then steps should be paid. But the board went on to say that it's not that simple. You have to look also, you have to look at all the other past practices of history. And when the board looked at that, again, it weighed the evidence of what happened at the situation that was closest in time and was factually similar and relied on that. Ask Me also says, argues that the board shouldn't have looked at what happened in 2012 or shouldn't have weighed it so heavily for a number of reasons. One, they say that, well, after the CBA, that CBA was negotiated in 2012, there was an agreement for retroactive payment of step increases. But that's a matter of bargaining between the parties. I mean, in this case, Ask Me and CMS could still reach an agreement for retroactive payment of step increases. That's a matter of bargaining. That's something for them to decide. And it may be because they have bargained that in the past. Maybe the Ask Me's unit members do have an expectation that they'll negotiate a clause to that effect in the next contract. But that doesn't change what the expectation is during this period of time and what the status quo is during this period of time. Ask Me also mentions that they have filed an unfair labor practice charge and a contract grievance in 2012. The contract grievance, the board found, wasn't relevant because this gets back to the statutory and contractual dichotomy. The contract grievance just said, well, CMS had a contract obligation under the extension agreements we signed to pay the step increases. That doesn't go to what's the status quo and whether CMS had a statutory obligation to pay. And the unfair labor practice charge, Ask Me never did not follow it to decision. They withdrew the charge. So they abandoned their argument that CMS had committed an unfair labor practice in 2012. And to the extent that there was a suggestion in the opening brief that such a claim would have been moved, the board has held on a number of occasions that just because you get retroactive payment after the fact for that period doesn't move whether or not an unfair labor practice occurred during that time because you would still have a violation of the act and the employees would still be without their step increases during that period of time. So there was nothing preventing Ask Me from continuing and pursuing its unfair labor practice charge to decision in 2012. Just a number of other things. Ask Me argues that the board should have put more emphasis on the pay plans from the 1970s that predated the bargaining relationship. If I could just finish with one or two quick sentences. As the board pointed out in length part, bargaining history that occurs during collective bargaining supersedes that prior history if there's a difference. And that's what happened here. The board looked at what has happened in this interim after collective bargaining. The one other thing that, well, I guess that's, I'll just stop there. There are a couple other points that are mentioned in the briefs. We'll, of course, rely on the briefs.  Thank you, counsel. Counsel? With respect to the issue of section 21.5, I think the court should resist the temptation to construe it. You don't have to. All you have to do is say the labor board was right, that the determination of the status quo is a statutory thing, and the labor board didn't have to go on after they made that determination to determine whether the contract was null and void by operational law. If you can't resist that temptation, then you need to look at the tolling agreements that were executed between the parties. And that's because what the state says is that contract rights existed up until June 30th. The tolling agreement expressly preserves all legal contractual rights that exist on June 30th. As cited in our opening brief, it's contained in the record at pages 1556 through 1558. So if there was a contract in effect on June 30th, if there were contractual rights that existed, the tolling agreement carried them through until there was an impasse between the parties and bargain as determined by the labor board. And that has not happened as we stand here. In addition, while it is true that the evidence at the hearing contained only the pay plan that was promulgated by CMS in July of 2015, it is not the case that there was no pay plan in effect for 2015 before that. In fact, and we have cited this in our papers as well, CMS promulgated a pay plan on January 1 of 2015 as well. You're entitled to take judicial notice of this because this is an official public document. And this pay plan also contained provisions in it that we cite in our brief. So again, it's a unilateral action of the employer. What's the date of that? This is dated last revised January 1, 2015. And it bears the name of Tom Tyrell, who's the acting director of CMS. And again, it's symptomatic of the employer's effort to have it both ways in this case. Because if the contract was not in effect, then the pay plan would have been in effect. There would have been no contract on top of it. And the pay plan provides support for steps and for movement under steps. So any reasonable employee would be able to rely on it. Isn't that the pay plan they chose to use? The July 1, 2015 pay plan? They're functionally identical, Your Honor. But since they made it, and the pay plan of July 28th was unique, except for two in the hearing. But the pay plan that was dated January 1 of 2015 was not in effect. And that's why I said it was not in effect. But the amount of payment that's being received is the equivalent of the July 1, 2015 pay plan. Is that true? The schedules are exactly the same. So if I move from step 3 to step 4 under item 1, my salary goes up. Okay. And despite all of the argument that you heard from the employees, you never heard anyone say, well, how do you go and determine what the terms and conditions of employment are if the contract's really null and void? And, you know, I suggest you look at what they were to a reasonable employer. Now, a couple more things. One is that it's just wrong to say that because the employer acted unilaterally in 2012 that they were able to erase a two decades long reasonable expectation of employers and employees. And it's wrong because we filed agreements that said you can't do that under the extension agreement that you signed. And they settled the agreements by agreeing to pay people their steps. They didn't have to settle the agreements. They could have taken it to arbitration. They could have taken it to arbitration and forced us to also pursue the unpermitted practice. But instead, they settled it by giving people their steps. And if you hold that an employer can make the unilateral change and then later agree to put it back in place and that erases all the reasonable expectations, then you're really giving employers a roadmap to violate the whole doctrine of status quo. You really eviscerated it. And that's why you should reverse the agency in this case. Thank you. Thank you, Counsel. We appreciate the briefs and the arguments twice, Counsel. And we'll take the matter under advisement. Thank you. Thank you. Thank you. Thank you. Okay. The next case of the oral argument is Robert.